The appellant, Jerry Youngblood, was convicted of murder, made capital because it was committed during the course of a robbery, § 13A-5-40(a)(2), and was sentenced to life imprisonment without parole. The appellant raises six issues for review.
The state's evidence tended to show that on April 8, 1992, the appellant and an accomplice, his brother, entered Dawson's Shop, which was owned by the victim, Mrs. Eula Mae Dawson. The appellant shot and robbed Mrs. Dawson, and she died shortly thereafter as a result of the gunshot wound she suffered. The bullet entered the victim's left arm, glanced off the bone, and entered her side, puncturing both lungs and her heart.
Mrs. Kathleen Rucker, a friend of the victim, testified that on the day of the shooting, the victim was sitting in her store with Mrs. Rucker. Mrs. Rucker testified that the appellant had come in the store earlier and had purchased some bubble gum. According to Mrs. Rucker, the appellant and his accomplice later entered the victim's store ostensibly to have a pair of pants repaired. As the appellant's accomplice was speaking to the victim about repairing the pants, the appellant walked over to the victim and demanded that she give him her money. Mrs. Rucker testified that he threatened to kill the victim if she did not comply. The appellant's accomplice then forced Mrs. Rucker to the floor and held her there. The victim was carrying a gun, and she tried to pull the gun out to protect herself and Mrs. Rucker. The appellant wrestled the gun away from the victim and once again threatened her life. Shortly thereafter, a shot was fired. After the victim had been shot, the appellant took the victim's purse and his accomplice took Mrs. Rucker's wallet. The two fled from the store. The appellant testified that they went across from the store to his cousin's house, divided the money, and hid the gun.
A search of the appellant's house uncovered four live rounds of ammunition for a .32 caliber handgun. A search of the appellant's cousin's house revealed the victim's purse, containing a check made out to the victim, Mrs. Rucker's purse, a .32 caliber handgun, and a fired .32 caliber bullet casing. The appellant told the police where the items were located.
Forensic experts testified that the fired bullet casing had been fired from the .32 caliber handgun seized by the police. The forensics experts further testified that the bullet recovered from the body of the victim had been fired from that handgun. Based on this evidence, the experts testified that they were of the opinion that the weapon recovered from the appellant's cousin's house was the weapon used to kill the victim.
The appellant testified at trial. He denied entering the store before the robbery to buy bubble gum. He admitted that he entered Dawson's Shop with the intent of robbing the victim. The appellant admitted shooting the *Page 387 
victim, but he denied that he shot her intentionally. The appellant testified that he had unintentionally fired the gun while he and the victim were struggling.
 I
The appellant initially contends that the circuit court erred in denying his motion to suppress his extrajudicial statements. Specifically, he argues that, considering his low level of intelligence and his hearing impairment, he could not have made a voluntary, knowing, and intelligent waiver of hisMiranda[1] rights. The appellant had made three statements to the police, two of which were tape-recorded.
The record indicates that, before the trial court received the statements into evidence, it held a suppression hearing. Detective K.C. Baldwin of the Montgomery police department testified that he had taken the appellant's statement and tape-recorded it soon after the appellant's arrest. Detective Baldwin said that he read the appellant his Miranda rights before taking the statement and that the appellant stated that he understood those rights and signed a waiver relinquishing those rights. In this statement, the appellant denied shooting the victim. Detective D.H. Carmichael of the Montgomery police department testified that he questioned the appellant in his office soon after his interview with Detective Baldwin. Detective Carmichael said that he did not read the appellant his Miranda rights again at this time. Detective Carmichael said that he asked the appellant where the victim had been shot and that the appellant replied "right there," pointing to his left arm. The appellant admitted that he had shot and robbed the victim. Thereafter, the appellant was again read hisMiranda rights, and a third statement was taken, the second one to be tape-recorded. Before giving this statement, the appellant stated that he heard and understood his rights, and he signed a waiver relinquishing those rights. In this last statement to Detective Carmichael, the appellant confessed to shooting and robbing the victim.
In each of the tape-recorded statements, the appellant was asked to read the waiver of rights form. Each time, the appellant read the waiver and stated that he understood that he was waiving his rights as these rights had been read to him by the police officer. The police officers involved in questioning the appellant testified that the appellant seemed to understand the rights that were read to him and the waiver that he read for himself.
The appellant offered evidence that his level of intelligence was below average. The court appointed Dr. Karl Kirkland, a licensed psychologist, to assess the appellant's intelligence. He testified that the appellant could read on a second-grade level. The appellant's IQ score is 73, which is borderline normal. However, taking all things into consideration, Dr. Kirkland concluded that the appellant had the mental capacity to knowingly, intelligently, and voluntarily waive hisMiranda rights. Based upon the testimony of Dr. Kirkland and the testimony of the police officers involved, the trial court denied the appellant's motion to suppress the statements.
"The findings of the trial court on a motion to suppress are binding on this Court unless they are clearly erroneous."State v. Austin, 596 So.2d 598 (Ala.Cr.App. 1991). See alsoState v. Caldwell, 611 So.2d 1149 (Ala.Cr.App. 1992), cert. denied, ___ U.S. ___, 114 S.Ct. 284, 126 L.Ed.2d 234 (1993). We have often held that "[t]he fact that a defendant may suffer from a mental impairment or low intelligence will not, without other evidence, render a confession involuntary." See Coloradov. Connelly, 479 U.S. 157, 163-65, 107 S.Ct. 515, 520,93 L.Ed.2d 473 (1986); Baker v. State, 599 So.2d 60, 63
(Ala.Cr.App. 1991), State v. Austin, supra, Holladay v. State,549 So.2d 122 (Ala.Cr.App. 1988), aff'd, 549 So.2d 135 (Ala. 1989), cert. denied, 493 U.S. 1012, 110 S.Ct. 575,107 L.Ed.2d 569 (1989).
Our review of the record convinces us that the state offered sufficient proof on the voluntariness of the statements to allow the court to find that they were voluntary. The state offered the testimony of the police officers involved in the questioning of the appellant that the appellant was givenMiranda *Page 388 
warnings prior to making the statements and that there was no coercion. Indeed, the appellant does not question the fact that he was given Miranda warnings. He contends only that he was not adequately communicated the rights because of his low mental capacity. The state offered expert testimony that the appellant was capable of understanding his rights guaranteed by Miranda
and that the appellant was capable of knowingly, intelligently, and voluntarily waiving those rights. The police officers involved testified that the appellant seemed to understand the rights they read to him from the Miranda form.
Appellant Youngblood proved that he suffered from a hearing impairment and that this impairment required him to read lips in order to effectively communicate. There was no evidence, however, that this impairment affected the voluntariness of his statements. In fact, during the taped confession in which the appellant admitted to shooting the victim, the police officer asked the appellant, after reading him his Miranda rights, "You heard what I said?" and the appellant answered, "Yes, sir." The appellant presented no evidence showing that he did not hear or understand the rights read as explained to him by the police officers.
Thus, the trial court did not err in denying the appellant's motion to suppress the statements he made to the police.
 II
The appellant next contends that the trial court erred in holding that the appellant had failed to make a prima facie showing that the state had violated Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). It appears that the appellant's Batson motion was untimely because it was not made before the jury was impaneled and sworn. Nance v. State,598 So.2d 30 (Ala.Cr.App. 1992); Fearn v. City of Huntsville,568 So.2d 349 (Ala.Cr.App. 1990).
Moreover, we have examined the record and we find that the trial court did not err in holding that the appellant failed to make a prima facie showing of a Batson violation. The record shows that the percentage of blacks in the prospective jury venire was approximately 23.8 percent. Five blacks sat on the jury. The percentage of blacks serving on the jury, excluding the alternates, was approximately 41 percent. Thus the percentage of blacks on the jury was greater than the percentage of blacks on the venire.
It is incumbent upon the party making a Batson objection to initially establish a prima facie case of discrimination.Batson, 476 U.S. at 93-94, 106 S.Ct. at 1721, 90 L.Ed.2d 69. See also Ex parte Bird, 594 So.2d 676, 679 (Ala. 1991). "Merely showing that the challenged party struck one or more members of a particular race is not sufficient to establish a prima facie case." Harrell v. State, 571 So.2d 1270, 1271 (Ala. 1990), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736
(1991). " 'When the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created.' " Edwards v. State,628 So.2d 1021 (Ala.Cr.App. 1993), quoting Harrell v. State, 571 So.2d at 1271. See also Raspberry v. State, 615 So.2d 657
(Ala.Cr.App. 1992). The trial court did not err in holding that the appellant failed to make a prima facie showing of discrimination to support his Batson motion.
The appellant also contends that the trial court erred in allowing the state to allow the trial court to make its last three preemptory strikes. Although the trial court's actions in making strikes on behalf of the prosecutor appear to make the trial court a member of the prosecutor's team and may be subject to attack on other grounds, the appellant has not shown that he was prejudiced under Batson. See Pettway v. State,624 So.2d 696 (Ala.Cr.App. 1993), cert. denied, 624 So.2d 700
(1993). The appellant did not make a prima facie showing of aBatson violation. The appellant also contends that the trial court erred in allowing the state to strike all Asian jurors from the jury venire. This issue, however, was not presented to the circuit court. Therefore, it is not subject to appellate review. Johnson v. State, 479 So.2d 1377 (Ala.Cr.App. 1985). *Page 389 
 III
The appellant's next issue is whether the trial court erred by allowing a police officer to testify as to the state of mind of another witness. Specifically, he argues very briefly that Officer Chris Hudgins of the Montgomery police department was allowed to testify as to the state of mind of Mrs. Rucker, in an attempt to rehabilitate her testimony.
On cross-examination by the state, Officer Hudgins testified that Mrs. Rucker appeared "very shook up" and that she was upset when he questioned her at the scene of the murder. The appellant did not object to these questions. The next questions asked of Officer Hudgins, to which the appellant objected, were merely questions concerning Officer Hudgins's experiences as a police officer.
The appellant never stated as a ground for his objection that Officer Hudgins was testifying as to the state of mind of Mrs. Rucker. Instead, the appellant objected on the ground that Officer Hudgins was being asked to state conclusions. "An objection on specific grounds waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Ex parte Frith, 526 So.2d 880, 882 (Ala. 1987).
 IV
The appellant argues that the trial court erred in refusing to give his requested jury charges numbers 4, 6, 12, and 13.
The substance of these charges was substantially covered in the trial court's oral charge to the jury. "It is a well-settled rule that when a written requested charge is refused, there is no prejudicial error when the requested charge is substantially covered in the court's oral charge."Weeks v. State, 611 So.2d 1156, 1158 (Ala.Cr.App. 1992),Norsworthy v. State, 542 So.2d 950 (Ala.Cr.App. 1989). See also Rule 21.1, A.R.Crim.P. Therefore, the trial court did not err in refusing to give the appellant's written requested charges numbers 4, 6, 12, and 13.
 V
The appellant next contends that the trial court erred in denying his motion for a judgment of acquittal. Specifically, the appellant argues that the state failed to prove that he intentionally caused the death of the victim. We disagree.
The state's evidence tended to show that the appellant took a .32 caliber handgun away from the victim, threatened to kill her if she did not give him her money, shot her, and took her purse. However, for the appellant to be guilty of capital murder under § 13A-5-40(a)(2), the jury had to find that the appellant intentionally caused the death of the victim during the course of the robbery in the first degree.
Whether the appellant intentionally caused the death of the victim is a question of fact for the jury. Carr v. State,551 So.2d 1169 (Ala.Cr.App. 1989). This court will not substitute its judgment for that of the jury. Owens v. State,597 So.2d 734 (Ala.Cr.App. 1992). Viewing the evidence in the light most favorable to the state, we conclude that there was evidence from which the jury could have been convinced beyond a reasonable doubt that the appellant intended to kill the victim. The trial court did not err in denying the appellant's motion for a judgment of acquittal.
 VI
The appellant next asserts that the trial court erred in striking for cause a prospective juror who expressed his beliefs against the death penalty and not striking a prospective juror who expressed his views in favor of the death penalty. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770,20 L.Ed.2d 776 (1968). The jury recommended a sentence of life imprisonment without parole.
 " 'The holding in Witherspoon [v. Illinois], 391 U.S. 510, [88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)], is not applicable where the jury recommends a sentence less than the death sentence. Bumper v. State of North Carolina, 391 U.S. 543, [88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)].' Eady v. State, 284 Ala. 327, 328, 224 So.2d 876, 877 (1969) (quoted in Neelley v. State, 494 So.2d 669, 680 (Ala.Cr.App. 1985), aff'd, 494 So.2d 697 (Ala. 1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987))." *Page 390 
Murry v. State, 562 So.2d 1348, 1358 (Ala.Cr.App. 1988). The appellant's argument is inapposite in this case because he was sentenced to life imprisonment without parole.
For the foregoing reasons, the judgment in this cause is due to be affirmed.
AFFIRMED.
All the Judges concur.
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).